# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION


VICKIE C. ZINGALE,

                        Plaintiff,

-vs-                                                        Case No.  2:11-cv-182-FtM-29SPC

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                        Defendant.

_____



## REPORT AND RECOMMENDATION[1]

        This matter comes before the Court on the Plaintiff, Vickie C. Zingale's, Complaint Seeking

Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the

Plaintiff's Claim for Disability Insurance (Doc. # 1) filed on March 30, 2011 in the Middle District

of Florida, Fort Myers Division.  The Plaintiff filed her Memorandum of Law in Support of the

Complaint (Doc. #13) on October 17, 2011.  The Commissioner filed the Memorandum of Law in

Support of the Commissioner's Decision (Doc. #14) on December 15, 2011.

        The Undersigned has reviewed the record, including a transcript of the proceedings before

the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings

and memoranda submitted by the parties in this case.

_____
[1]This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 42
U.S.C. § 405(g).

## <u>FACTS</u>

### *Procedural History*

The Plaintiff previously filed a Title II application for a period of disability and disability insurance benefits on September 1, 2005. (Tr. 10). The claim was denied, initially, on August 8, 2007, and again upon reconsideration on December 20, 2007. (Tr. 10). Plaintiff then filed a request for hearing on February 7, 2008. (Tr. 10). On August 14, 2009, Scott A. Tews, the administrative law judge (ALJ), held a video hearing. (Tr. 10). After the hearing the ALJ issued a decision denying Plaintiff's claim.

In his finding the ALJ found the Plaintiff met the insured status requirements of the Social Security Act through September 30, 2010. (Tr. 12). The ALJ stated the Plaintiff did not engage in substantial gainful activity after September 1, 2005. (Tr. 12). The ALJ found that the Plaintiff had severe impairments of status post spinal fusion back syndrome, headaches, and pain disorder. (Tr. 12). However, the ALJ did not find the Plaintiff had an impairment or combination of impairments that medically equaled a listed impairment. (Tr. 13). Finally, the ALJ found Plaintiff possessed the requisite residual functioning capacity to perform light work in a stable work environment and therefore, could perform a number of jobs in the national economy. (Tr. 14, 20). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision final. (Tr. 1-5). The Plaintiff has exhausted her administrative remedies. This case is ripe for review under 42 U.S.C. § 405(g).

*Plaintiff's History*

The Plaintiff was born on December 29, 1960, making her forty-eight (48) years old at the time of the hearing. (Tr. 31). She had completed high school and had some college education. Plaintiff also took several medical billing courses. (Tr. 32-33). Plaintiff's past work experience includes fifteen years as a medical billing specialist or in a similarly situated field. (Tr. 20, 38). The Plaintiff alleges disability due to status post spinal fusion with stimulator implantation, hypertension, major depression, insomnia, failed back syndrome, headaches and pain disorder. (Tr. 12).

*Medical History*

Plaintiff's disability began on September 1, 2009. Dr. Blatt first saw Plaintiff at Midwest Neurosurgery Associates on March 18, 2005. He advised Plaintiff that a lumbar fusion was the only option she had to reduce her back pain. (TR. 328). Plaintiff underwent surgery on March 22, 2005. The surgery required the doctor to perform a L5-S1 posterior lateral fusion. Additionally, Dr. Blatt performed a left L5-S1 neurolysis. (TR. 309).

Midwest Neurosurgery Associates saw Plaintiff again on April 1, 2005. The notes from the visit indicate that Plaintiff was still experiencing leg pain. However, her back felt better as a result of the fusion. (Tr. 320). A return visit in June 2005 led her treating physician, Dr. Blatt, to opine that Plaintiff's condition had improved compared to her preoperative state. Although she still had slight back discomfort, Dr. Blatt felt Plaintiff's condition would continue to improve as her fusion healed. (Tr. 319).

Subsequently, on September 16, 2005, Plaintiff was in a car accident. Because of the accident, Plaintiff began to experience occasional numbness going down her fingers and pain at the base of her neck. (Tr. 245). Doctors then scheduled Plaintiff for a MRI. The MRI revealed a reversal

of the normal Lordosis curvature due to a muscle spasm. Additionally, the MRI revealed a C5-6 disc protrusion, which compromised the spinal cord; a mild annulus bulging at C6-7; and a C7-T-1 mild disc protrusion. (Tr. 233).

On November 7, 2005, Plaintiff was admitted to Cape Coral Hospital after she overdosed on Soma. (Tr. 230). When asked why she attempted suicide, she stated that she wanted to be put out of the pain misery she was experiencing. (TR. 209). After her release, Plaintiff received psychiatric help at the Ruth Cooper Center for less than 24 hours. (Tr. 209). Plaintiff made a subsequent visit to Dr. Schaerf on November 16, 2005, and during the visit denied suicidal ideation. (Tr. 209). In his report, Dr. Schaerf recapped Plaintiff's medical history, which included a microdiskectomy in 2002 and a L5/S1 spinal fusion in 2005. With this information, Dr. Schaerf diagnosed Plaintiff with major depression, chronic pain, and personality vulnerabilities. (Tr. 209).

On August 1, 2006, Plaintiff visited Dr. Daitch for the first time. (Tr. 222). In their first session Dr. Daitch took Plaintiff's medical history. (Tr. 222). The history included Plaintiff's reports of lower back pain, pain on the left side of her upper extremities and neck pain, right neck and shoulder pain. (Tr. 222). As a result of her neck and shoulder pains, Plaintiff had problems turning her head. Furthermore, Plaintiff's neck pain would radiate from her neck to her lower back. Resulting from this, Plaintiff experienced difficulty sleeping, loss of energy, depression, sad moods, and loss of appetite. (Tr. 223).

After a physical examination Dr. Daitch noted that Plaintiff was only somewhat depressed. (Tr. 224). In regard to physical symptoms, the doctor noted that Plaintiff's cervical range of motion decreased by thirty (30) percent. Plaintiff mainly experienced pain over the C5-6 interspace. (Tr. 224). The doctor diagnosed Plaintiff with Cervicalgia, diffuse neck pain, and radiating pain in her

right scapula area. (Tr. 225). To cure these problems Dr. Daitch recommended epidural injections. If Plaintiff did not respond to the injections then Dr. Daitch proffered several alternatives, which included a right C6 transforaminal, bilateral diagnostic facet injections and possible radio-frequency. (Tr. 225).

In the meantime, Plaintiff continued to see her mental health doctors. On September 12, 2006, Plaintiff visited Dr. Schaerf because she was upset with her daughter's therapy. (TR. 191). Ms. Zingale continued to experience neck pain and needed trigger-point injections, epidural Botox, and physical therapy. (Tr. 191). Under the heading of "continuing impression", Dr. Schaerf opined that he thought Plaintiff suffered from major depression, chronic pain, personality vulnerabilities, and marital discord. (Tr. 191).

On September 20, 2006, Plaintiff visited Dr. Daitch. The doctor noted his impressions that Plaintiff improved since her Botox injections. The headaches were much better and her neck pain decreased. Even Ms. Zingale thought that the Botox injections helped. Nevertheless, she still complained of right lumbar reticular symptoms and of pain in her right cervical elevator scapula. (Tr. 220). Accordingly, Dr. Daitch noted that Plaintiff would need more Botox in her right trapezium and elevator scapula. (Tr. 220).

Plaintiff visited Dr. Schaerf on October 16, 2006, complaining of headaches with sensitivity to light. In an attempt to resolve the problem, Dr. Schaerf prescribed Plaintiff an increased dosage of Effexor and Lamactil. On October 19, 2006, Plaintiff presented to Advanced Management Pain complaining of acute migraine headaches. Doctors at Advanced Pain Management tried injections to stop the pain. Plaintiff received a prescription for Maxalt.

By May 2, 2007, Dr. Daitch was seeking authorization for a spinal stimulator in hopes that

it would reduce or cure Plaintiff's bilateral lumbar reticular pain. (Tr. 212). In a letter, Dr. Daitch stated that Plaintiff had a diagnosis of lower extremity neuralgia, lumbar reticular pain, and lumbar post-laminectomy syndrome, which persisted despite multiple avenues of unsuccessful medical treatment. (Tr. 212). However, a little over a month later, doctors put a hold on the back stimulator because Plaintiff began to experience pain in her lower back and in her left leg. (Tr. 236). Instead, doctors ordered an MRI, which revealed a pedicle screw and posterior rod fixation at the L5-S1 level without spondylolisthesis and no abnormal contrast enhancement seen at the conus medullaris. (Tr. 275). Plaintiff's L5-S1 had experienced considerable susceptibility artifact and there appeared to be some residual left foraminal disc protrusion and disc bulging. However, this was compatible with Plaintiff's prior appearances. (Tr. 275).

Plaintiff returned to see Dr. Blatt on July 13, 2007. Dr. Blatt, after he reviewed Plaintiff's medical records, opined that Plaintiff had mild LS radiculopathy secondary to lateral recess stenosis and her lower back pain was most likely associated with mild discogenic pain. (Tr. 317). Dr. Blatt also found the Plaintiff had good strength. Concerning the spinal stimulator, Dr. Blatt expressed doubt as to the stimulator's success on her axial spine, although he seemed confident it would help her left leg symptoms. (Tr. 317). Dr. Blatt further opined that any additional aggressive intervention was a bad idea, as was the renewal of her Percocet prescription. (Tr. 317). On August 22, 2007, Plaintiff underwent a trial for a spinal cord stimulator to control her pain and on September 11, 2007, doctors implanted a permanent spinal cord stimulator. (Tr. 346, 371).

Plaintiff's pain, however, remained and she soon began to receive transforaminal lumbar epidural injections from Dr. Daitch. Her first injection occurred in February 2008. She subsequently received shots in March, June, and July of that same year. These shots provided Plaintiff with pain

relief. (Tr. 440-460).

On May 18, 2009, Plaintiff visited Dr. Daitch and reported she had fallen a week earlier. (Tr. 483). The fall increased her back pain and Dr. Daitch, while administering an injection, thought he saw some of the lumbar screws slip. (Tr. 483). Plaintiff went to Dr. Blatt for a second opinion in July of 2009. Dr. Blatt noted that as a result of the fall Plaintiff now complained of pain in her right leg. (Tr. 484). Nevertheless, Dr. Blatt concluded that Plaintiff's L5-S1 was solidly fused. Dr. Blatt found that Plaintiff's degenerative changes apparently progressed at L4-5 but with no clear nerve root impingement. (Tr. 484). Furthermore, Dr. Blatt found Plaintiff neurologically alert and oriented with appropriate knowledge and memory fund, and with good motor strength- with the exception of her lower left extremity. Dr. Blatt's final conclusion was that Plaintiff's failure to progress is because "Plaintiff gives a really poor effort that is clearly effort related." (Tr. 484).

Finally, on October 2, 2009, by order of the ALJ, Plaintiff went to Dr. Cheryl Kasprzak. During Plaintiff's visit, Dr. Kasprazak administered a Weschsler Adult Intellectual Scale test and a Medical Source Statement of Ability to do Work-related Activities. (Tr. 489-492). The results of the Weschsler test indicated that Plaintiff fell in the average to below average range of intellectual ability. Nevertheless, Dr. Kasprzak felt that Plaintiff possessed the requisite skills and cognitive capacity to manage finances independently of others. (Tr. 492).

### *Administrative Law Judge's Decision*

Upon consideration of the record, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act from September 1, 2005, through the date of this decision. (Tr. 10). In reaching his decision, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2010. (Tr. 12). The ALJ found that

Plaintiff had not engaged in substantial gainful activity since September 1, 2005. Additionally, the ALJ further found that Plaintiff had impairments consisting of status post spinal fusion with stimulator implantation, hypertension, major depression, insomnia, failed back syndrome, headaches, and pain disorder. (Tr. 12). Furthermore, the ALJ found Plaintiff's impairments severe as defined in 20 CFR 404. 1520(c), 416.920(c), and Social Security Rulings 85028 and 96-3p. (Tr. 12).

However, the ALJ found that Plaintiff's impairments did not meet or medically equal the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 13). The ALJ determined that, despite the severity of Plaintiff's impairment, no treating or examining physician mentioned a finding equal in severity to the criteria of any listed impairment, nor does medical evidence show that Plaintiff's impairments are equal to any listed impairment on the Listing Impairments. (Tr. 13). In support of this determination, the ALJ specifically considered whether Plaintiff's mental impairment met or medically equaled the criteria listed in 12.04 (Tr. 13). The ALJ found that Plaintiff's mental impairment did not cause at least two marked limitations or one marked limitation with repeated episodes of decompensation for an extended duration. (Tr. 14). Therefore, Plaintiff did not satisfy paragraph B's criteria. (Tr. 14).

In his discussion of paragraph B's criteria, the ALJ noted the limitations identified in paragraph B do not provide an assessment of residual functioning capacity. (Tr. 14). Instead, the criteria rate mental impairments at steps 2 and 3 of the evaluation process. (Tr. 14). When the ALJ evaluated Plaintiff's residual functioning capacity, the ALJ's assessment reflected the degree of limitation the ALJ found in his paragraph B mental functioning analysis. (Tr. 14).Even with his inclusion of Plaintiff's mental function analysis, the ALJ found that Plaintiff had the residual functioning capacity to perform light work, as defined in 20 CFR 404.1567(b). (Tr. 14).

The ALJ also found that Plaintiff possesses the ability to perform simple routine, competitive, low stress, and repetitive tasks on a sustained basis over a normal eight (8) hour workday in a stable work environment. (Tr. 14). After carefully considering the evidence, the ALJ found that although Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms are not credible because they are inconsistent with the residual functional capacity assessment. (Tr. 16).

After assessing Plaintiff's residual functional capacity, the ALJ found Plaintiff unable to perform any past relevant work. (Tr. 20). The demands of Plaintiff's past relevant work exceed Plaintiff's current residual functional capacity. (Tr. 20). However, the ALJ found that, despite Plaintiff's inability to engage in work similar to her past occupations, Plaintiff did have the residual function capacity to perform a significant number of jobs. (Tr. 20). Specifically, the ALJ noted that the vocational expert believed the Plaintiff could work as a storage facility clerk, mail sorter clerk, hostess, or in a similar field. (Tr. 21). As such, the ALJ found Plaintiff capable of making a successful adjustment to work, which exists in "significant numbers" in the national economy, and therefore, found Plaintiff not disabled. (Tr. 21).

### THE STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, and whether the findings are supported by substantial evidence. Hibbard v. Commissioner, 2007 WL 4365647 at *2 (M.D. Fla. December 12, 2007) (citing Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971); McRoberts v. Bowen, 841 F. 2d 1077, 1080 (11th Cir. 1988)). In evaluating whether a claimant is disabled, the ALJ must follow

the sequential inquiry described in the regulations.[2] 20 C.F.R. §§ 404.1520(a), 404.920(a). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion." Hibbard, 2007 WL 4365647 at *2 (citing Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838–39 (11th Cir. 1982))); Richardson, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Phillips v. Barnhart, 357 F. 3d 1232, 1240 n.8 (11th Cir. 2004). The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." Phillips, 357 F. 3d at 1240 n.8; Dyer v. Barnhart, 395 F. 3d 1206, 1210 (11th Cir. 2005). If the Commissioner's decision is supported by substantial evidence, it

---

[2] The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability. The steps are as follows:

*Step 1*. Is the claimant engaged in substantial gainful activity? If the claimant is engaged in such activity, then he or she is not disabled. If not, then the ALJ must move on to the next question.

*Step 2*. Does the claimant suffer from a severe impairment? If not, then the claimant is not disabled. If there is a severe impairment, the ALJ moves on to step three.

*Step 3*. Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, then the claimant is disabled. If not, the next question must be resolved.

*Step 4*. Can the claimant perform his or her former work? If the claimant can perform his or her past relevant work, he or she is not disabled. If not, the ALJ must answer the last question.

*Step 5*. Can he or she engage in other work of the sort found in the national economy? If so, then the claimant is not disabled. If the claimant cannot engage in other work, then he or she is disabled. See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f).

should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1439 (11th Cir. 1997).

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the case.  42 U.S.C. § 405(g)(sentence four).  The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  Williams v. Commissioner, 407 F. Supp. 2d 1297, 1299-1300 (M.D. Fla. 2005) (citing Keeton v. Dep't of Health and Human Servs, 21 F.3d 1064, 1066 (11th Cir. 1994)); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).

## DISCUSSION

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

Plaintiff argues that the ALJ erred in his decision to deny Plaintiff disability and disability insurance benefits. As grounds, Plaintiff contends the ALJ failed because he improperly disregarded Dr. Datich's functioning capacity determination, assigned the improper weight to Dr. Datich's medical opinion, and that substantial evidence does not support the ALJ's decision. The government filed a brief in support of the ALJ's decision.

*1. Whether the ALJ properly disregarded Dr. Datich's residual functioning capacity determination.*

In his decision, the ALJ noted in Dr. Daitch's opinion the Plaintiff is completely disabled. The ALJ dismissed Dr. Daitch's opinion because it was an opinion on an issue reserved for the Commissioner's determination. (Tr. 19). Plaintiff contests this ruling by the ALJ.

The ALJ is required to review all medical findings and other evidence that support's a medical source's statement that a claimant is disabled. Shird v. Astrue, 635 F. Supp.2d 1319, 1333 (M.D. Fla. June 10, 2009). Nevertheless, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. Id.(quoting 20 C.F.R. § 404.1527(e)). The ALJ need not give special significance to the status of a physician as treating or non-treating in weighing an opinion on whether a claimant meets a listed impairments, a claimant's residual functional capacity(20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because ultimate determinations are within the providence of the Commissioner. 20 C.F.R. § 404.1527(e)).

In response to this opinion the ALJ stated, "the determination of disability is an issue reserved for the Commissioner and as such the undersigned is not bound to give any special significance to the source of such an opinion. (Tr. 19). The ALJ was correct when he stated that the determination of disability is an issue reserved for the Commissioner. Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case… that would direct the determination or decision of disability." SSR 96-5p, 1996 WL 374183 *2 (S.S.A. July 2, 1996). An example of such an issue is whether an individual is disabled under the Act. Id.

The ALJ did not err in his refusal to give Dr. Daitch's opinion controlling authority. (Tr. 24). Dr. Daitch's is not a medical opinion under Social Security regulations. *Compare* 20 C.F.R. §§

404.1527(e) and 416.927(e) with <u>SSR 96-5p</u>, 1996 WL 374183 *2. Instead, it is a dispositive finding left to the ALJ. *See* <u>Heppell-Libsansky v. Commissioner of Social Security</u>, 170 Fed. Appx. 693, 697 (11th Cir. 2006); <u>Shird</u>, 635 F. Supp.2d at 1333; SSR 96-5, 1996 WL 374183 *2. Therefore, the ALJ did not err by disregarding Dr. Daitch's opinion that Plaintiff was completely disabled.

### *2. Whether the ALJ assigned the proper weight to evidence obtained from Dr. Daitch.*

Plaintiff asserts that the ALJ erroneously weighed the records of Dr. Daitch and failed to give his opinion the proper weight. As grounds, Plaintiff argues that the medical evidence does not conclusively counter Dr. Daitch's opinion. Specifically, Plaintiff argues the ALJ erred in giving Dr. Blatt's medical opinion controlling weight, considering Plaintiff's work search, and giving Dr. Kasprzak's medical opinion great weight. Because of this, Plaintiff argues the ALJ's decision not to give Dr. Daitch's opinion controlling weight is not supported by the record.

The ALJ, in refusing to give Dr. Daitch's opinion controlling weight, found Dr. Daitch's medical opinion inconsistent with the record as a whole. (Tr. 19). Dr. Daitch arrived at this conclusion when he stated "the claimant cannot use her feet for repetitive movements as in operating foot controls and cannot bend, squat, crawl, or climb. He opined that the claimant is able to reach above shoulder level." (Tr. 19). Based on the aforementioned opinions Dr. Daitch indicated that the claimant has received the complete gamut of treatment, and remains completely incapacitated despite maximal medical treatment. (Tr. 19).

While substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician, unless there is good cause to do otherwise, (<u>Lewis</u>, 125 F.3d at 1440; <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir.1991); 20 C.F.R. § 404.1527(d)), the ALJ may discount a

physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. Natale v. Commissioner, 2008 WL 227957 *6 (M.D. Fla. January 25, 2008).When a physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d).

After considering the aforementioned factors, the ALJ may find good cause exists when the treating physician's opinion was not supported by the record, was inconsistent with the physician's own records, or was based primarily on the Plaintiff's subjective complaints. Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1159-60 (11th Cir. 2004). Furthermore, the weight afforded a physician's opinion depends upon the extent by which it is supported by clinical or laboratory findings and is consistent with other evidence in the record. Wheeler v Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence, supports a contrary finding, or is wholly conclusory. Edwards, 937 F.2d 580 (ALJ properly discounted treating Physician's report where the physician was unsure of the accuracy of his findings and statements); Morrison v. Barnhart, 278 F. Supp. 1331, 1334 (M.D. Fla. 2003). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings

and other consistent evidence of a claimant's impairments. <u>Schnor v. Bowen</u>, 816 F.2d 578, 582 (11th Cir. 1987); <u>Heckler</u>, 784 F.2d at 1075.

The ALJ, after weighing the required factors, had good cause to discount Dr. Daitch's opinion that Plaintiff is incapacitated as inconsistent with the record as a whole. Specifically, in making his determination the ALJ relied upon and contrasted Dr. Daitch's opinion with Dr. Blatt's medical evidence and opinion, Plaintiff's continued search for work, the medical record as a whole, and Dr. Kasprzak's medical evidence and opinion.

## A. Dr. Blatt's Medical Opinion and Evidence.

Dr. Blatt's medical evidence and opinion offers a different view of Plaintiff's disability. According to the ALJ, Dr. Blatt opined that Plaintiff "really gives a poor effort that is clearly effort related." (Tr. 17). The ALJ further noted that in Dr. Blatt's opinion, Plaintiff is capable of making improvement if she applies herself. (Tr. 19). Not only does Dr. Blatt believe that Plaintiff can improve with effort; Dr. Blatt also believes that Plaintiff actually believes that some of the treatment Plaintiff has undergone is unnecessary.(Tr. 16). Specifically, Dr. Blatt opined that Plaintiff does not medically require an assistive device for ambulation. (Tr. 19).

The ALJ further noted that although Plaintiff had degenerative changes at L4-5 no clear root impingement existed. (Tr. 17). Dr. Blatt's CT scan on May 20, 2009 showed Plaintiff was solidly fused at L5-S1. (Tr. 17). Additionally, the ALJ noted that Dr. Blatt's physical motor examination showed good strength throughout, with the only exception being her lower left extremity. (Tr. 17). This, according to the ALJ, proves that Dr. Daitch's opinion contradicts the medical evidence opinion from Dr. Blatt.

When the ALJ evaluated Dr. Blatt's opinion and gave it controlling weight, he stated "Dr. Blatt has examined the claimant, utilized medically acceptable clinical and laboratory diagnostic techniques to diagnose her impairments and provided treatment on a continuing basis for a substantial period of time." (Tr. 19). Based on the above the ALJ had good reason to give Dr. Blatt's opinion controlling weight because objective medical evidence supports his opinion.

Plaintiff, however, argues the ALJ failed to consider Dr. Blatt's motor deficit questionnaire in the context of the rest of Dr. Blatt's records. Plaintiff contends that because the ALJ failed to consider the questionnaire in the context of the remaining records, the ALJ erroneously gave Dr. Blatt's opinion controlling weight. Nevertheless, Dr. Blatt's opinion is not inconsistent with his own medical findings or the record. Plaintiff argues that Dr. Blatt knew Plaintiff was considering placement of the dorsal column stimulator by Dr. Daitch. Although Dr. Blatt knew Plaintiff was considering the procedure, he did not think it medically necessary. As the ALJ stated "[Dr. Blatt]... opined that an assistive device is not medically necessary for ambulation." (Tr. 19). Therefore, Dr. Blatt's opinion and statement does not conflict with the questionnaire's findings and the ALJ did not err by giving his opinion controlling weight. See (Tr. 18). Furthermore, the ALJ's reasoning, based on Dr. Blatt's opinion that Plaintiff is not incapacitated was correct and demonstrates the conflict between Dr. Daitch and Dr. Blatt's opinions.

### B. Plaintiff's Search for Employment.

Next, the ALJ bolstered his conclusion by citing Plaintiff's continued search for work. The ALJ noted "claimant repeatedly reported that she was looking for work and also testified to the fact that she tried to go on some interviews because she wanted to go back to work." (Tr.18). Dr. Datich's opinion that Plaintiff is medically incapacitated contradicts these findings. Although the ALJ may

not consider Plaintiff's search for employment as a determining factor of disability, he may consider the search for purposes of assessing credibility. *See* <u>Ellison v. Barnhart</u>, 355 F.3d 1272, 1276 (11th Cir. 2003) (stating that work activity constitutes substantial evidence to support the ALJ's decision to discredit an examining physician's opinion of disability)(citing <u>Oldham v. Schweiker</u>, 660 F.2d 1078, 1084 (5th Cir. 1981). From this assessment, the ALJ may consider whether Dr. Datich's medical opinion is consistent with this part of the record.

The ALJ found Plaintiff's search for employment undermined her credibility. Based on this credibility finding, the ALJ found Plaintiff's credibility conflicted with Dr. Datich's medical opinion. Specifically, the ALJ stated that a completely incapacitated person would not have wanted to return to work as Plaintiff did. As such, the ALJ concluded, "the fact that claimant's impairment did not prevent her from working at that time strongly suggests that it would not currently prevent work." (Tr. 18).

### C. Dr. Kasprzak's Medical Opinion and Evidence.

In support of his contention that Plaintiff is capable of working and therefore not incapacitated, the ALJ cited the opinion of Dr. Kasprzak, the doctor who performed a psychiatric evaluation on Plaintiff. Dr. Kasprzak found Plaintiff's chronic pain would interfere with complex work decisions. However, Dr. Kasprzak also found Plaintiff's condition only moderately affected Plaintiff's ability to interact appropriately with supervisors and co-workers.(Tr. 20). Plaintiff's condition only moderately affects her ability to respond appropriately in usual work situations and changes in routine work settings. (Tr. 20). Dr. Kasprzak's findings further support the ALJ's decision to discount Dr. Daitch's opinion because it too demonstrates that Plaintiff can in fact work in a normal work environment and she is not completely incapacitated.

Therefore, the ALJ did not err when he did not assign controlling weight to Dr. Datich's medical opinion because it was inconsistent with the record as a whole. The ALJ articulated specific reasons for why he did not assign Dr. Daitch's opinion controlling weight. Specifically, the ALJ found Dr. Daitch's opinion conflicted with Dr. Blatt and Dr. Kasprazak's medical opinions and with Plaintiff's own actions after receiving treatment. Because of the aforementioned reasons, the ALJ had good cause in not assigning Dr. Daitch's opinion controlling authority as it was not supported by the record as a whole.

### 3. Whether the ALJ's decision is supported by the substantial weight of the evidence.

Next, Plaintiff argues that substantial evidence does not support the ALJ's decision. Specifically, Plaintiff argues that the ALJ's decision to dismiss the opinion of Plaintiff's ex-husband, her pursuit of work and her pursuit of custody are insufficient reasons to reject Plaintiff's credibility. Plaintiff further argues that the ALJ's decision to give great weight to Dr. Kasprzak's medical opinion is not supported by substantial evidence.

### A. Whether the ALJ's decision finding Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms not credible is supported by substantial evidence.

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Foote, 67 F.3d 1561-1562; Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. Hale v. Bowman, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons

for discrediting subjective pain testimony requires that the testimony be accepted as true. Foote, 67 F.3d at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

Here the ALJ found Plaintiff's testimony concerning the intensity, persistence, and limiting effects of Plaintiff's symptoms not credible. (Tr. 16). Specifically, the ALJ stated,

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity.(Tr. 16).

In support of his decision, the ALJ stated that claimant's testimony is not supported by and is inconsistent with the medical evidence of record. (Tr. 16). As mentioned earlier, the ALJ referenced Dr. Blatt's opinion regarding Plaintiff's back.[3] This according to the ALJ is proof that Plaintiff's complaints were not as persistent or intense as she claimed

The ALJ further found that Plaintiff's daily activities "are not limited to the extent one would expect, given the complaints of disabling pain symptoms and limitations." (Tr. 17). While the

---

[3] See supra, at 15 (The factors, which influenced Dr. Blatt's opinion regarding Plaintiff's back are discussed in detail).

performance of everyday tasks cannot be used to make a determination that the Plaintiff was not disabled, performance can be used as a measure of the Plaintiff's credibility in regard to his ability to perform certain tasks. *See* Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) (noting that the ALJ properly discredited a treating physicians testimony by pointing out the contrasts in the claimants daily activities and the physicians diagnosis); Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002) (upholding the ALJ's finding that the claimant's allegations of disabling pain were not credible because her daily activities demonstrated otherwise). *See* Norris v. Heckler, 760 1154, 1158 (11th Cir. 1985) (holding that an ALJ may consider the plaintiff's demeanor when making a credibility determination). The ALJ noted that Plaintiff can straighten counters. (Tr. 17). Plaintiff testified.

> she can do cleaning in spurts and may clean one room one day and another room the next day… [she]  drives a vehicle everyday as she takes he daughter to school and to medical doctor appointments, grocery shops with her daughter once to twice weekly, cooks meals nightly… and does 5 loads of laundry weekly. (Tr. 17-8).

As such, Plaintiff's daily activity conflicts with her subjective complaints. This conflict supports the ALJ's finding that Plaintiff's complaints concerning the intensity, persistence, and limiting effects of her symptoms are inconsistent with the record as a whole.

Additionally, the ALJ noted that Plaintiff worked after the alleged onset date of disability. (Tr. 18). Although Plaintiff's work did not rise to the level of substantial gainful activity according to the ALJ, the fact that Plaintiff's impairment did not prevent her from working strongly suggests that it would not currently prevent her from working. (Tr. 18). The ALJ also found Plaintiff's job search for part-time employment after the onset date to support his argument that Plaintiff's condition is not so severe such that she is unable to perform all work activities. (Tr. 18). As the ALJ stated,

[t]he claimant testified that she worked after the alleged onset date. While her work activity did not rise to the level of substantial gainful activity, the fact that the claimant's impairment did not prevent her from working at that time strongly suggests that it would not currently prevent work. Furthermore, the claimant repeatedly reported that she was looking for work and also testified to the fact that she tried to go on some interviews because she wanted to go back to work. She further testified that she was trying to find something part time and every time they would ask her why she hasn't worked she would tell them that she had back surgery and then she never heard back. The claimant reported on December 1, 2005[,] that she was looking for work. In therapy the claimant reported that she looked at her plans for employment and Mr. Lente indicated that she used him as a sounding board for a new career shift. She reported that her ideas employed past skills and knowledge base in a different manner. The claimant reported that she has applied for many jobs since 2005 from ads appearing in the newspaper and has not been hired as she mentions to them her medical problems. The claimant reported to her psychiatrist that she was not depressed and was working on her own business. Dr. Schaerf noted that claimant minimized psychiatric symptoms. On January 13, 2009[,] the claimant related that it would be best if there was some option for her to work outside the home. The claimant's search for work during the time period relevant to this decision suggests that the claimant's condition is not so severe that she is unable to perform all work activities.

Additionally, Plaintiff argues the Ticket to Work program protects her past employment and job searches. According to Plaintiff, the Ticket to Work program abolishes the dichotomous approach used by the ALJ. Plaintiff believes because of the program people are no longer either disabled or capable of work. According to Plaintiff, a disabled individual can work and not have their receipt of disability benefits affected.

The Ticket to Work program is intended to help expand the number of service providers to claimants who are entitled to OASDI benefits based on disability or eligible for social security benefits. 20 C.F.R. § 411.105. The program is voluntary program and allows eligible disability recipients to receive vouchers from the Social Security Administration that they use to obtain

employment, vocational, or other services from participating employment networks. 20 C.F.R. 411.100 – 411.730. Although participation is voluntary, individuals applying to participate in the program must meet eligibility requirements. To be eligible, you must be eighteen or older and not sixty-five, a title II beneficiary, and you are in current pay status for monthly title II cash benefits based on disability. 20 C.F.R. § 411.135(a) – (a) (1) (B). A claimant holding a ticket may assign the ticket to an employer within any participating employment network of his or her choice that will accept that individual. 42 U.S.C.A. §1320b-19(b)(2).

Plaintiff is correct that the Ticket to Work Program allows disabled individuals to work without it affecting their receipt of disability benefits. Congress may not view disability and work as mutually exclusive, however, for Plaintiff to claim protection under the Ticket to Work program she must have a ticket. Plaintiff is not enrolled nor has she offered evidence of enrollment. Therefore, Plaintiff's argument that the Ticket to Work program and its purpose to promote disabled people to work is inapplicable as to her because Plaintiff is not enrolled in the program and therefore cannot invoke its protection.

As such, the ALJ did not err when he considered Plaintiff work activity after the alleged onset date of disability. Work activity may be considered as evidence that Plaintiff's subjective complaints were not as severe as reported, even if the work did not constitute substantial gainful activity. _See_ Ellison v. Barnhart, 355 F.3d at 1275-6; _see also_ Melton v. Apfel, 181 F.3d 939, 941 (8th Cir. 1999) (noting that the claimant's part-time work after the alleged onset date of disability was allowed as evidence to undermine the claimant's subjective complaints)). A person incapacitated with the degree of pain complained of by Plaintiff, which persisted as long as she complained, would not have

returned to work nor looked for work as consistently as Plaintiff did. The ALJ did not err when he considered Plaintiff's work activity. Moreover, Plaintiff's work activity supports the ALJ's decision.

Next, the ALJ noted Plaintiff's pursuit of custody of her daughter as support of his decision. Plaintiff argues that there is nothing in the record to support the ALJ's opinion that Plaintiff's daughter requires special assistance. That, however, is not true. The record reflects that Plaintiff's daughter required an aide in elementary school to assist in test taking. The record further reflects that Plaintiff was referred to the state disability office to learn about services available to her daughter. (Tr. 432,471). Based on this information, evidence does support the ALJ's finding that Plaintiff's daughter required special assistance. Because of this required assistance, the ALJ found that if Plaintiff could take on such responsibility on her own, then her persistence, intensity, and limitations of her disability are not as great as she claims. As such, Plaintiff's own conduct, specifically her pursuit of work and child custody demonstrates how the limitations complained of from her disability are inconsistent from what the medical record actually reflects.

Finally, the ALJ found evidence that the claimant has not been entirely compliant in taking prescribed medications. This prompted the ALJ to believe that Plaintiff's symptoms are not as limiting as Plaintiff alleges. (Tr. 18). A refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability. Ellison, 355 F.3d at 1275 (quoting Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988)). A finding of poverty will excuse noncompliance as will a financial inability to comply with the prescribed treatment. Dawkins, 848 F.2d at 1214.

In support of this argument, the ALJ indicated that the Plaintiff was off Lamictal though she was supposed to increase her dosage in January 2006. (Tr. 18). Moreover, Dr. Blatt also supports the ALJ's finding when he opined "[the Plaintiff] really gives a poor effort that is clearly effort related."

(Tr. 17). The Plaintiff has not introduced evidence of poverty as an excuse nor has she argued she was financially unable to maintain her current course of treatment. Plaintiff's inaction precludes a finding of disability because she refused to follow a treatment plan aimed to alleviate her pain. Plaintiff's refusal to follow a treatment plan further supports the ALJ's decision to not find Plaintiff credible because if her pain were as intense, persistent, and limiting as claimed, she presumably would follow her treatment plan.

Based on the following, the ALJ decided that Plaintiff did not suffer from debilitating pain if she engaged in such actions. Consequently, the ALJ clearly articulated his reasons for finding the record inconsistent with Plaintiff's subjective pain complaints. He stated his reasons as 1) Plaintiff's story is inconsistent with the medical record and 2) Plaintiff's daily activities do not support her complaints. Because the ALJ clearly articulated his reasons for not crediting Plaintiff's testimony and supported it with substantial evidence, the court will not disturb the ALJ's decision. Moreover, the ALJ provided enough evidence in support of his decision and the Plaintiff failed to satisfy their burden of proving her pain complaints.

### B. Whether the ALJ assigned the correct weight to the medical opinion's of Dr. Kasprzak.

One of the medical opinions the ALJ relied on in arriving at the aforementioned conclusions was from Dr. Kasprazak. Plaintiff argues the ALJ erroneously relied on the psychiatric evaluation of Dr. Kasprzak. Plaintiff indicates the ALJ stated his purpose for Dr. Kasprazak's evaluation was to assess Plaintiff's memory issues. This review took place on October 2, 2009. (Tr. 19). After review of this evaluation, the ALJ gave great weight to Dr. Kasprazk's opinion. The ALJ reasoned that,

> Dr. Kasprazak examined the claimant, spoke with the claimant regarding the claimant's impairments and symptoms, performed diagnostic tests on the

claimant, and reviewed the claimant's medical records. [Additionally], Dr. Kasprazak's opinion is consistent with other substantial evidence in the record." (Tr. 20).

The opinions of physicians who are one time examiners are generally not entitled to great deference. McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Edwards v. Astrue, 2009 WL 2525495 *3 (M.D. Fla. Aug. 17, 2009). However, there is no support for a contention that the opinion of a non-treating medical expert should be evaluated any differently than opinions of other physicians. Id. Furthermore, the weight afforded a physician's opinion depends upon the extent by which it is supported by clinical or laboratory findings and is consistent with other evidence in the record. Wheeler, 784 F.2d at 1075.

Here the ALJ gave Dr. Kasprzak's opinion great weight. The ALJ assigned the opinion great weight despite Dr. Kasprzak having only examined Plaintiff once. Nevertheless, the ALJ articulated sufficient reasons for giving Dr. Kasprzak great deference and those reasons are consistent with the other medical evidence. In giving Dr. Kasprzak great deference the ALJ stated, "Dr. Kasprzak examined the claimant, spoke with the claimant regarding the claimant's impairments and symptoms, performed diagnostic tests on the claimant, and reviewed claimant's medical records. In addition, Dr. Kasprzak's opinion is consistent with the other substantial evidence in the record." (Tr. 20). Therefore, the ALJ did not err by giving Dr. Kasprzak's opinion great weight because substantial evidence supports his decision.

Substantial evidence substantiates the ALJ's decision. The ALJ supported his decision to discredit Plaintiff's complaints concerning the intensity, persistence, and limitations of her condition with substantial evidence from the record and did so clearly. Therefore, substantial evidence supports the ALJ's decision.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED**:

The Decision of the Commissioner Regarding the Plaintiff Vickie Carolyn Zingale should be **AFFIRMED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this   12th   day of March, 2012.


SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE


Copies: All Parties of Record